UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

SANTIAGO R. URTECHO,

       Plaintiff,

v.                                    Case No. 5:14cv155/CJK

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

       Defendant.
_____/

## MEMORANDUM ORDER

       This case is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Santiago Urtecho's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in this case, including entry of final judgment.  Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, will be affirmed and the application for benefits denied.

## ISSUES ON REVIEW

       Santiago Urtecho, who will be referred to as claimant, plaintiff, or by name, raises three issues on appeal: (1) the ALJ failed to comply with the regulations when evaluating Dr. Ross's opinion; (2) the ALJ failed to comply with the regulations when

analyzing plaintiff's credibility; and (3) the ALJ's Step Five analysis is unsupported by substantial evidence because the vocational expert's testimony was based upon an incomplete hypothetical question. (Doc. 16).

## PROCEDURAL HISTORY

On February 28, 2011, Urtecho filed applications for DIB and SSI, alleging disability beginning on September 1, 2006. T. 196-223, 237.[1] The application for DIB was denied initially on October 27, 2011, and upon reconsideration. T. 97-111, 119-25. Claimant appeared before an Administrative Law Judge ("ALJ") for a hearing on February 21, 2013. T. 43. On April 5, 2013, the ALJ issued a decision denying the claim for benefits. T. 16-41. The Appeals Council denied claimant's request for further review and, as a result, the ALJ's decision became the final determination of the Commissioner.[2] T. 2-4.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

• Claimant has the following severe impairments: alcohol abuse, history of polysubstance abuse, substance induced mood disorder, anxiety disorder NOS, major depressive mood disorder NOS, history of seizures, and panic disorder. T. 22.

• Claimant's impairments, including his substance use disorders, meet sections

---

[1] The administrative record, as filed by the Commissioner, consists of twelve volumes (docs. 12-2 through 12-12) and has 879 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

[2] Although plaintiff initially filed applications for DIB and SSI, both the ALJ's decision and the Appeals Council's order denying the request for review indicate only a claim for DIB is in dispute. T. 6, 19.

12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d)). T. 22.

• If claimant stopped substance abuse, he would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d)). T. 25.

• If claimant stopped substance abuse, he would have the residual functional capacity to perform a full range of work at all exertional levels but with certain nonexertional limitations.  He could respond appropriately to supervisors, co-workers, and customers or other members of the general public, but interaction should be casual and non-confrontational, and feedback should be supportive.[3]  He could use judgment in simple, one or two-step work-related decisions, but could not use judgment in detailed or complex work-related decisions.  He could deal with changes in a routine work setting, but changes should be infrequent and presented gradually. He could understand, remember, and carry out simple one and two-step instructions, but he could not understand, remember, and carry out detailed or complex instructions.  He could maintain attention, concentration, or pace for periods of at least two hours, with regular breaks.  With medication compliance and sobriety, he could also maintain activities of daily living and he would experience no episodes of decompensation of extended duration.  Additionally, due to his history of seizures, he could never work around unprotected heights, moving machinery, or work in

---

[3] Claimant could respond appropriately to coworkers, customers, or other members of the general public, but interaction should be casual, infrequent, and non-confrontational. T. 26.

occupations that required driving and he could tolerate only frequent exposure to marked changes in temperature and humidity.  T. 26-27.

> • If claimant stopped substance abuse, considering claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that claimant could perform (20 C.F.R. §§ 404.1560(c) and 404.1566).  T. 35.

> • Claimant's substance use disorder is a contributing factor material to the determination of disability because claimant would not be disabled if he stopped the substance use (20 C.F.R. §§ 404.1520(g) and 404.1535).  Because the substance use disorder is a contributing factor material to the determination of disability, claimant has not been disabled within the meaning of the Social Security Act at any time from September 1, 2006, through April 5, 2013.  T. 36.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at1439).

Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, re-weigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d. 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10-cv-725-FtM-29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[4]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[4] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.    If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[5]

5.    Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, he is not disabled.

---

[5] Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir.  1986).

In a case involving drug or alcohol use, "[a]n individual shall not be considered to be disabled for purposes of [benefits under Title II of the Act] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d). The Commissioner has interpreted the language of the statute by finding that drug addiction or alcoholism is "material" if the individual would not still be found disabled if alcohol or drug use were to cease. 20 C.F.R. § 404.1535. The claimant has the burden of proving that he would still be disabled even if he were to stop using alcohol or drugs. *Doughty v. Apfel,* 245 F.3d 1274 (11th Cir. 2001).

## FACT BACKGROUND AND MEDICAL HISTORY[6]

Claimant self-reported an extensive history of problems with alcohol abuse, depression, and anxiety. In June of 2010, plaintiff sought treatment from the Veterans Administration ("VA"), reporting "some depression" and frequent alcohol use. T. 452. The examining nurse noted claimant's blood pressure was elevated. T. 454. At a VA appointment on August 16, 2010, Dr. Marilyn Hovarth performed a psychiatric consult. T. 343-46. Mr. Urtecho reported a history of blackouts, seizures, alcohol-induced hallucinations, and withdrawal symptoms. T. 343. Dr. Hovarth noted claimant had mild tremors and was "not responding to internal stimuli." T. 344-45. Although admitting to feeling depressed, plaintiff denied having any suicidal thoughts. T. 343. Dr. Hovarth, however, found the suicidal ideation risk assessment

---

[6] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record. The facts below, where not derived from the medical records, are based largely, if not entirely, on plaintiff's testimony in that regard. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

was positive.  T. 345.  Dr. Hovarth assigned a Global Assessment of Functioning ("GAF") score of 50 and recommended detoxification.[7]  T. 346.

In accordance with Dr. Hovarth's recommendation, claimant entered inpatient detoxification on August 19, 2010.  T. 336.  He reported "a long history of alcohol dependence, drinking approximately a bottle of vodka daily."  T. 336-37.  He responded well to medication and therapy; the GAF score improved from 40 at admission to 55 at discharge.  T. 336.  When actively participating in group therapy, he was described as "easily engaging in conversation with staff and other patients." T. 376.  Upon discharge on August 26, 2010, plaintiff was noted as "calm and cooperative" and "alert," with no delusions.  T. 336-39.

After discharge, claimant began attending outpatient rehabilitation sessions as part of a Substance Abuse Treatment Program.  At the initial session on September 23, 2010, plaintiff "reported symptoms of depression and anxiety, including sad mood, insomnia (difficulty staying asleep), and excessive worry "about everything."

---

[7] The Global Assessment of Functioning Scale, or "GAF," is primarily used by mental health practitioners.  The scale provides medical professionals a way to give an opinion numerically, "rat[ing] the occupational, psychological and social functioning of adults."  *See Smith v. Comm'r of Soc. Sec.*, No. 6:10-cv-1478-Orl-31KRS, 2011 WL 6217110, at *4 n.1 (M.D. Fla. Nov. 1, 2011). The Social Security Administration has not endorsed the GAF scale for use in the SSI disability program.  *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (noting that a GAF score may assist ALJ in formulating residual functional capacity, but is "not essential to the RFC's accuracy").  GAF scores are not a direct indication of an individual's disability status, but rather are only recognized as a tool to assist the ALJ in forming a decision.  *See Wind v. Barnhart*, 133 F. App'x 684, 691-92 n.5 (11th Cir. 2005).  A low GAF score does not dictate a finding of disability, without evidence indicating impairment associated with maintaining gainful activity.  *See Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782. F. Supp. 2d 152, 165 (W.D. Pa. 2011) ("[While] GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability.").  Because plaintiff contends the ALJ misconstrued the GAF scores in the record, the scores receive particular attention in this case.

T. 731.  Claimant recounted an extensive history of alcohol use, noting he relapsed after discharge from inpatient detoxification and "his longest period of sobriety was for '2 months' about 3 years ago."  T. 732, 737.  Progress notes from a nurse practitioner assessed alcohol dependance and anxiety disorder.  T. 697.  Plaintiff continued the treatment program through March 2011.  T. 597-681.

At a subsequent appointment with the VA on March 17, 2011, plaintiff reported panic attacks despite compliance with his medication regimen.  T. 546.  On March 22, 2011, plaintiff reported sobriety for 122 days.  T. 540.  He reported depression and was assessed with "baseline high anxiety."  T. 540-41.  During the appointment, plaintiff was "agitated," his legs were constantly moving, he was tearful, he had mild slurring in speech, and a "fearful/anxious" affect.  T. 541.  For "years" plaintiff reported dealing with a racing heart, tingling in fingers, neck pain, headaches, and nausea.  T. 540.  These symptoms increased when in a small room with unfamiliar people.  T. 540-41.  The thought of people "dropping in" and disrupting plaintiff's schedule greatly bothered him.  T. 541.  He had thoughts about having his head "blown off and out a window," but said those thoughts were more obsessive than actual plans to harm himself.  T. 541.

Plaintiff began visiting Dr. Wayne Ross on May 31, 2011.  T. 765-68.  At the first appointment, claimant reported rarely using alcohol during the last year; his main issue was anxiety.  T. 765.  He indicated he avoided crowds, constantly moved his legs, felt "shaky inside," and suffered panic attacks once a week.  T. 765.  Dr. Ross diagnosed panic disorder, recurrent major depressive disorder, and generalized anxiety disorder.  T. 767.  Dr. Ross assigned a GAF score of 60, indicating "moderate symptoms," and adjusted medication.  T. 768.  The following month, claimant was

"doing ok," had no panic attacks, and medication slightly improved his depression. T. 769.  Plaintiff stated he had been sober for seven months and was sleeping better but "worr[ies] all day long about the future."  T. 769.  Dr. Ross adjusted claimant's medication and, consonant with his reported improvement, assigned a GAF score of 65.  T. 769-70.

On July 27, 2011, claimant reported "good days and bad days."  T. 771. Although Dr. Ross noted claimant was less depressed and had good eye contact, concentration, memory, insight, and judgment, he was still anxious and his legs were restless.  T. 771.  Dr. Ross again assigned a GAF score of 65, indicating plaintiff's overall condition was relatively unchanged from the previous month. T. 772.  During the July 2011 appointment, Dr. Ross completed a pre-printed Mental Capacity Assessment questionnaire.  T. 817-19.  The assessment indicated no difficulties in understanding and remembering locations and work procedures, understanding or remembering simple or detailed instructions, and carrying out simple instructions; slight difficulties in carrying out detailed instructions, maintaining socially acceptable appearance, and being aware of normal work place hazards; moderate difficulties in keeping consistent pace, asking questions, and responding to change in the work place; marked difficulties in working closely with others, making simple work related decisions, accepting criticism from a supervisor, and getting along with co-workers; extreme difficulties with completing a normal work day or week without interruptions due to psychologically based symptoms, and in traveling to new places, using public transit, and working in public.  T. 817-19.  Dr. Ross believed claimant could voluntarily control his use of alcohol and noted alcohol use had no effect on the assessment.  T. 819.

In August of 2011, plaintiff reported "severe anxiety" and insomnia.  T. 825. Dr. Ross, however, noted mood was less depressed and activities of daily living were good.  T. 825.  Dr. Ross assigned a GAF score of 55.  T. 825.  Plaintiff then missed three consecutive appointments with Dr. Ross on September 20, September 26, and October 4, of 2011.  T. 826-28.  A chart entry dated September 26, 2011, stated the doctor's "last time with [claimant] showed [claimant] with his new girlfriend to be acting differently and [staff] noted when making appointment that he sounded under the influence of something[.]"  T. 827.

On October 19, 2011–shortly after the missed appointments–plaintiff was admitted to Anchor Hospital with complaints of suicidal ideation.  T. 804.  Plaintiff was diagnosed with major depressive disorder and assigned a GAF score of 30.  T. 804.  For treatment, plaintiff "participated daily in group therapy, expressive therapy, and psychoeducation group."  T. 805.  He admitted he found the group therapy and medication he received helpful.  T. 805.  He underwent a comprehensive internal medicine consultation and physical exam, with normal results, T. 804-811, and was discharged on October 28, 2011.  T. 805.  Although assigned a GAF score of 35, he was noted to be calm, cooperative, sleeping, and eating well.  T. 805-06.  Claimant denied any suicidal ideation.  T. 805.

Claimant returned to the care of Dr. Ross and his staff on November 3, 2011, reporting severe anxiety since his discharge from the hospital.  T. 829.  He was "anxious about up-coming court date for alleged DUI," had difficulty falling asleep, and was sober for the last nine months.  T. 829.  On November 15, 2011, one of Dr. Ross's associates, Dr. Gurpreet Ahluwalia, noted plaintiff's affect was blunted and he "has some anxiety and mood swings."  T. 831.  Dr. Ahluwalia assigned a GAF

score of 55.  T. 832.  The following month, plaintiff reported he was anxious, moody, and depressed.  T. 835.  Dr. Ahluwalia's assessment indicated claimant "is depressed and has psychosis."  T. 835.  Plaintiff also told a licensed professional counselor that he wanted a social life but could not deal with people and did not want to attend group therapy.  T.  833.  Plaintiff failed to show up for his December 20, 2011, appointment.  T. 837.

In March 2012, Dr. Howard Leizer, a state psychological consultant, reviewed the medical record.  Dr. Leizer assessed the following limitations: mild restrictions of activities of daily living, moderate difficulties in social functioning, moderate deficiencies in concentration, and one or two episodes of decompensation (each of extended duration).  T. 105-109.  Dr. Leizer also noted claimant is able to perform simple, unskilled work.  T. 105-109.

On November 29, 2012, Mr. Urtecho returned to the Veterans Administration hospital, reporting a history of severe headaches, seizures, depression, and anxiety.  T. 868.  He was out of medication.  T. 867-76.  A primary care nursing note reflected depression but "normal judgments" and "mentally capable of decision making."  T. 867-876.  During a psychological evaluation in January of 2013, plaintiff admitted to  binge drinking for the last ten days and complained of depression and anxiety for the past five years.  T. 861-63.  Plaintiff reported he had been sober for four months out of the last nineteen years.  T. 863.  Despite treatment with medication, claimant had "residual anxiety, tension, apprehension, and inability to relax."  T. 861.  Panic attacks were situational, occurring in crowded public areas.  T. 861.   The progress notes stated energy, appetite, and motivation were "ok."  T. 861-63.   The progress notes also showed plaintiff was alert, cooperative, oriented times four, and dressed

appropriately.  T. 865-66.  He had normal gait, psychomotor activity, attention, and concentration.  T. 865-66.  His thought process was noted as logical, and he had fair insight and judgment.  T. 865-66.  The progress note charted moderate depression, some panic attacks, insomnia, and irritability.  T. 858.  The evaluating psychiatrist diagnosed depressive disorder and assigned a GAF score of 56.  T. 866.

During the hearing before the ALJ, claimant and vocational expert Robert Strader ("VE") testified.  T. 46-49.  Plaintiff stated he had not worked since 2006 and was unable to work due to "[d]epression, anxiety, and the chances of seizures."  T. 56.  His past work included time as a Navy weather observer, a prep cook, and a dump truck driver.  T. 53-54.  Plaintiff described severe episodes of depression, occurring once every two weeks, with each episode lasting up to three days.  T. 58-59.  During these episodes, he did not get out of bed, and had suicidal thoughts and nightmares.  T. 59, 61.  Claimant also had problems being around other people and could not deal with strangers very well.  T. 57.  As to his daily capabilities, claimant recounted he could get up, shower, read, watch TV, and sometimes go fishing with his roommate.  T. 58.  The VE testified that jobs existed in the national economy that a person with plaintiff's residual functional capacity ("RFC") could perform.  T. 89-91.

Dr. Nathan Strahl, a licensed psychiatrist working with the Social Security Administration, evaluated the record and testified at the hearing.  Dr. Strahl stated claimant's alcohol use was causing functional limitations, such as moderate and marked functioning capabilities when drinking.  T. 63-76.  According to Dr. Strahl, with medication compliance and sobriety, claimant would not have any functional limitations that would preclude him from working the jobs listed by the vocational

expert.  T. 63-72.  With sobriety, he would have no episodes of decompensation; the past episodes were due to substance abuse.  T. 75.

## ANALYSIS

Plaintiff raises three claims of error: (1) the ALJ failed to comply with the regulations when evaluating Dr. Ross's opinion; (2) the ALJ failed to comply with the regulations when analyzing plaintiff's credibility; and (3) the ALJ's Step Five analysis is unsupported by substantial evidence because the vocational expert's testimony was based upon an incomplete hypothetical question.  (Doc. 16).

Dr. Ross

Claimant argues the ALJ improperly evaluated the opinion of a treating physician, Dr. Ross.  (Doc. 16, p. 8-13).  When a treating physician's opinion regarding claimant's condition is bolstered by medically acceptable clinical techniques, and is consistent with the other evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2).  The Commissioner, however, is not bound by a treating or examining physician's opinion when "good cause" exists for rejecting it.  *See* 20 C.F.R. § 404.1527(c); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 1986).  "Good cause" is present where: (1) the treating physician's opinion is not supported by the evidence; (2) the evidence contradicts the treating physician's opinion; or (3) the treating physician's opinion is conclusory or inconsistent with his own medical records.  *Phillips*, 357 F.3d at 1241.  "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 357 F.3d at 1241.  Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.

1986)); *see also Nyberg v. Commissioner of Social Security*, 179 F. App'x 589, 591 (11th Cir. 2006).

The ALJ gave Dr. Ross's opinion–as expressed on the Mental Capacity Assessment–"some weight to the extent that it [was] consistent with [claimant's] residual functional capacity[.]" T. 32. The ALJ gave Dr. Ross's opinion little weight, however, to the extent it concluded "the claimant would have marked or extreme limitations in his ability to work around other people, accept criticism, adapt to change, use public transportation, or complete a workday or workweek without interference from psychologically based symptoms." T. 33. Plaintiff asserts the ALJ erred by not assigning controlling weight to Dr. Ross's opinion because: (1) Dr. Ross's opinion was consistent with his treatment notes; (2) the ALJ mischaracterized plaintiff's subjective statements; (3) the ALJ misconstrued the GAF scores in the record; (4) the ALJ erroneously gave more weight to the opinion of a non-examining medical expert rather than Dr. Ross; and (5) the "ALJ failed to consider the factors of 20 C.F.R. §§ 404.1527(c), 416.927(c), when determining what weight to afford to Dr. Ross's opinion." (*Id.*, p. 8-13). Each assertion is addressed in turn.

First, plaintiff claims the conclusions on Dr. Ross's Mental Capacity Assessment are supported by the treatment notes. (Doc. 16, p. 9-10). Although Dr. Ross's treatment notes reflect anxiety, depression, insomnia, mood swings, and constant leg movement during appointments, T. 769, 771, 776, 825, 831, 833, 835, the notes do not suggest plaintiff's condition was as severe as indicated on the Mental Capacity Assessment.[8] As the ALJ noted, at plaintiff's initial appointment on May

---

[8] Dr. Ross's opinion was expressed on a pre-printed check-off form of unknown origin. T. 817-19. Where an opinion, even that of a treating physician, is offered on a preprinted check-off form that does not detail evidence in the record supporting the work-related limitations identified,

31, 2011, Dr. Ross assessed a GAF score of 60, reflecting only "moderate symptoms." T. 30, 768.  The finding that plaintiff suffered from only moderate symptoms is inconsistent with the extreme limitations found on the Mental Capacity Assessment. *See Gilabert v. Comm'r of Soc. Sec.*, 396 F. App'x 652 (11th Cir. 2010) (holding ALJ properly rejected severe limitations contained in treating physician's opinion when the physician assigned claimant GAF scores in the high 50s to 60s, reflecting only moderate difficulty in functioning).  In addition, the ALJ correctly observed that plaintiff's condition improved after medication stabilization. T. 32-33. For example, Dr. Ross's June 20, 2011 notes indicate "[c]lient is doing ok he has had no panic attacks, depression is slightly improved on meds, and is sleeping better at night[.]" T. 769.  On July 27, 2011, Dr. Ross noted claimant was "less depressed."  T. 771.  For both June and July, Dr. Ross indicated claimant's GAF score was 65.  T. 770, 772. Notably, these relatively positive assessments of plaintiff's condition occurred during the same period of time that Dr. Ross completed the Mental Capacity Assessment. T. 819.  The ALJ, therefore, correctly noted that Dr. Ross's treatment notes do not support the dire predictions of the Mental Capacity Assessment.

Plaintiff next claims the ALJ erred in rejecting Dr. Ross's opinion based on claimant's subjective reports because the ALJ mischaracterized those reports.  (Doc. 16, p. 10).  The ALJ observed that Dr. Ross's opinion was undermined by "claimant's

---

such opinion will not bind the Commissioner.  *See Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("Check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions."  (citing *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985))); *see also  Czanderna v. Colvin*, No. 3:14cv615CJK,  2015 WL 3620716 at *7 (N.D. Fla. June 9, 2015)  ("The SQRFC opinion furnished by Dr. Sarazin was a preprinted check-off form that cited no clinical or medical findings whatsoever and provided no insight into or rationale for the expressed conclusions.")

Case No. 5:14cv155/CJK

own subjective reports of being able to take public transportation, socialize with friends, and to being 'doing okay' while sober[.]"  T. 33.  Plaintiff, however, asserts (1) he only indicated he was "doing okay" once on December 20, 2010, during VA alcohol dependence counseling; (2) he rarely went outside because he was not good with people; (3) he traveled by car, not public transportation; and (4) he did not always participate in group therapy discussions, and, eventually, did not want to attend at all.  (Doc. 16, p. 10).  In response, the Commissioner notes plaintiff "seeks to qualify [the ALJ's] evidence" but "does not allege the reported activities and/or statement cited by the ALJ are untrue."  (Doc. 17, p. 10).

Review of the record indicates the ALJ's use of claimant's subjective statements to discount Dr. Ross's opinion is supported by substantial evidence. Contrary to plaintiff's current assertion that he only reported doing okay once on December 20, 2010, the record contains several references to claimant doing "okay." Dr. Ross's June 20, 2011, treatment notes indicate "[c]lient is doing ok he has had no panic attacks, depression is slightly improved on meds, and is sleeping better at night[.]" T. 769.  In addition, plaintiff reported "feeling 'pretty good'" at a March 10, 2011, mental health consult.  T. 551.  Plaintiff also "describe[d] his mood as okay" when he was admitted to the hospital for detoxification in August of 2010.  T. 337.

The ALJ's reference to plaintiff's use of public transportation, his social activities, and his group therapy attendance was also proper.  Contrary to plaintiff's claim that he rarely went outside, he actually testified that he went fishing with his roommate.  T. 58.  Claimant also reported going food shopping once or twice a week. T. 286.  In September of 2011, Dr. Ross noted claimant had a "new girlfriend."  T. 827.  In addition, Lynne Watters, plaintiff's friend, reported claimant used public

transportation, went to the library, went outside daily, and shopped.  T. 257, 260, 261. Watters also reported that "a few times a month" claimant would go to restaurants, to the movies, and attend social events.  T. 261.  Although plaintiff did not always participate in group therapy or want to attend, T. 350, 833, the record supports the ALJ's observation that claimant found group therapy helpful. T. 537, 644-51, 805. Thus, substantial evidence supports the ALJ's finding that claimant's subjective statements and activities of daily living undermined the conclusions found on Dr. Ross's Mental Capacity Assessment.  T. 818.

Claimant next says the ALJ's partial rejection of the Ross opinion based on two high GAF scores was inappropriate because "the ALJ fail[ed] to consider Plaintiff's GAF scores in the remainder of the record" and "picked out only the most positive GAF scores as a basis for rejecting Dr. Ross's opinion."  (Doc. 16, p. 11-12). Plaintiff emphasizes that during a period of sobriety in October of 2011, he was hospitalized for suicidal ideation and assigned a GAF score of 30.  (*Id.*, p. 11).

Explaining his evaluation of Dr. Ross's opinion, the ALJ noted "claimant was given a Global Assessment of Functioning of 60 only two months earlier and on January 14, 2013, the claimant was given a Global Assessment of Functioning of 56 at the VA.  These assessments are inconsistent with Dr. Ross's opinion." T. 33.  The ALJ also expressly noted "GAF scores appear in the medical evidence of record ranging from 30 to 60." T. 32.  Explaining this variance, the ALJ reasoned:

> Significantly, the claimant's lower GAF scores routinely correspond with substance abuse and/or medication noncompliance.  Nevertheless, those scores generally reflect a moderate impairment in mental functioning when evaluated together over his course of treatment.  To that extent, I afford them substantial weight, noting that GAF score[s] reflect functioning during a discreet moment in time and are generally

not reliable indicators of overall mental health when viewed in isolation, especially during time of noncompliance and substance abuse.

T. 32.   The record supports the ALJ's finding that claimant's higher GAF scores corresponded to periods of sobriety and treatment compliance.   For instance, when he presented to the hospital on August 19, 2010, for detoxification, plaintiff's GAF score was 40.   T. 336.   After receiving medication and participating in individual, group, recreational, occupational, and music therapy, plaintiff was discharged on August 26, 2010, with a GAF score of 55.   T. 336-39.   Although plaintiff had GAF scores of 30 and 35 in October of 2011, the very next month, Dr. Ahluwalia assessed claimant's GAF score at 55.   T. 832.   Moreover, it is not apparent the "routine urinalysis" performed upon admission to Anchor Hospital in October of 2011 was intended to detect the presence of alcohol.   T. 804.   The majority of plaintiff's GAF scores were above 50, indicating only moderate difficulties in functioning.[9]   T. 336, 531-32, 544, 558, 768, 770, 772, 832, 866.   Thus, the ALJ's reference to GAF scores to discount the weight given Dr. Ross's opinion is supported by substantial evidence.

Plaintiff expands this issue by arguing the ALJ wrongly assigned Dr. Strahl's opinion more weight than Dr. Ross's opinion.   (Doc. 16, p. 12).   Plaintiff is correct that the ALJ gave great weight to the opinion of Dr. Strahl, the non-examining state agency psychiatrist, finding the opinion consistent with the record as a whole.   T. 34. Unmentioned by plaintiff, but recognized in the controlling regulations, is that state agency medical and psychological consultants are "highly qualified physicians,

---

[9] A GAF score between fifty-one and sixty indicates moderate difficulties or symptoms in social, occupational, or school functioning.   *See Wind v. Barnhart,* 133 F. App'x 684, 687 n.1 (11th Cir. 2005) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000-TR)).

psychologists, and other medical specialists who are also experts in Social Security disability evaluation." *See* 20 C.F.R. § 404.1527(e)(2)(i). Acknowledging this expertise, the Eleventh Circuit has explained that, in a proper case, the ALJ does not err by giving substantial weight to the opinions of non-examining physicians, including state agency medical and psychological consultants. *See Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008).[10] Dr. Strahl's status as a non-examining medical expert, therefore, does not *ipso facto* preclude the ALJ from assigning more weight to Dr. Strahl's opinion than Dr. Ross's.

Claimant contends "Dr. Strahl's basis for his opinion is questionable" because he "mischaracterize[d] [the] medical evidence." (Doc. 16, p. 12-13). At the hearing, the ALJ asked Dr. Strahl whether claimant would meet any listings if substance abuse were factored out. T. 69. After concluding claimant would not meet any listing, Dr. Strahl noted:

> Despite the fact that the medical records show some evidence that as of 2011-2012 that there is no alcohol or less alcohol involved there are some statements within the record that are disputable in terms of his drinking behavior, so I do not have clear evidence in the medical record that there has been a stoppage of alcohol and I have . . . two statements that are made that are inaccurate stating to the doctor that he's not been using substances when he – alcohol when he has and then the last record

---

[10] True enough, the consultant's report alone should not constitute good cause for the ALJ to discredit treating physician opinions. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Where the ALJ does articulate good cause, however, the opinions of consultants may take on particular significance. *See Voronova v. Astrue*, No. 3:11cv709-J-32JBT, 2012 WL 2384414, *6 (M.D. Fla. May 7, 2012) (explaining that the "rule" suggesting that non-examining doctors are entitled to little weight is most often stated in the face of treating physician opinions that "have not otherwise been validly discounted"). Here, as explained above, the ALJ articulated good cause to discount Dr. Ross's opinion because the opinion was inconsistent with the doctor's treatment notes, claimant's subjective statements, and claimant's GAF scores.

[from January 14, 2013] indicates binge drinking. . . . So I see that the alcohol use has been fairly prolific and there are statements on May 11, [2011, indicating rare] use of alcohol for a year when that's just not correct.  We know he's been drinking in March 2011 he was treated for alcoholism[.]

T. 69-70, 765.  Medical records from March 10, 2011, and March 22, 2011, however, indicate plaintiff reported sobriety for 110 and 122 days, respectively.  T. 540, 550.

Although Dr. Strahl mistakenly stated claimant was drinking in March of 2011, other evidence in the record supports Strahl's conclusion that claimant's reports of sobriety were contradictory and, more specifically, that the May 31, 2011, report of rare alcohol use for one year was not correct.  For example, on August 19, 2010–within the supposed one year period of rare alcohol use–claimant entered inpatient detoxification and reported "a long history of alcohol dependence, drinking approximately a bottle of vodka daily."  T. 336-37.  After his discharge, plaintiff visited a psychologist with the VA and admitted he relapsed in September of 2010.  T. 732.  The psychologist noted claimant "was a very poor historian regarding the quantity of his alcohol use."  T. 732.  In addition, on January 14, 2013, plaintiff reported sobriety for only four months in the past 19 years.  T. 863.  Dr. Strahl also noted that during the October 20, 2011, psychiatric evaluation at Anchor hospital, plaintiff "denie[d] a history of addiction."  T. 78, 810.  Thus, despite the mistaken premise that plaintiff was drinking in March of 2011, Dr. Strahl's assertion that plaintiff's reports of sobriety were inconsistent finds support in the record.  Consequently, the ALJ did not err in giving substantial weight to Dr. Strahl's opinion.

Concluding this issue, plaintiff claims the ALJ failed to consider the factors of 20 C.F.R. § 404.1527(c) when evaluating Dr. Ross's opinion.  (Doc. 16, p. 13).  Specifically, claimant notes Dr. Ross had provided treatment since May 31, 2011, and

therefore had a longitudinal picture of impairments.  (*Id.*).  This argument is without merit.  The ALJ discussed plaintiff's treatment history with Dr. Ross, including that the doctor had treated claimant since late May of 2011.  T. 29-30.  Moreover, Dr. Ross completed the Mental Capacity Assessment in July of 2011, less than two months after he began treating claimant.  The ALJ's failure to make explicit references to Social Security regulations concerning factors relevant to weighing doctors' opinions does not constitute reversible error where, as here, the ALJ applied criteria supported by substantial evidence.

Plaintiff's Credibility

Next, plaintiff claims the ALJ erred in analyzing credibility.  In the decision, the ALJ noted the following about claimant's credibility:

> Inconsistent reports and testimony from the claimant and the fact that the record contains observations of generally stable examination findings, with no significant change in his condition, detracts from the credibility of the claimant's statements as to his functional limitations and the severity of his alleged symptoms.  While the above inconsistencies may not have been the product of a conscious attempt to mislead on the part of the claimant, they nonetheless undermine the credibility of his statements in reporting activities of daily living and functional abilities.  Accordingly, I find the claimant's statements are not entirely credible pursuant to Social Security Ruling 96-7p.

T. 31-32.  Claimant objects to this finding, saying the ALJ "failed to identify the periods of sobriety when Plaintiff continued to suffer from his mental health issues." (Doc. 16, p. 15).  The implication is that plaintiff had the same issues when sober. Plaintiff notes four urine tests conducted in December of 2010 were negative for the presence of alcohol.  T. 659.  Plaintiff also points out that when he was hospitalized for suicidal ideation on October 19, 2011, his urinalysis was "unremarkable."  (Doc. 16, p. 15); T. 804.  During these two periods there is potentially objective evidence

of claimant's sobriety. Claimant's claims of *extended* sobriety, however, are based solely on his statements to examining doctors. And claimant's self-reports of sobriety are inconsistent. When he began treatment with Dr. Ross on May 31, 2011, claimant reported "rare [alcohol use] now for 1 year." T. 765. In a follow-up appointment on November 3, 2011, plaintiff reported he had been sober for seven months. T. 829. On January 14, 2013, plaintiff, apparently in a moment of lucid introspection, stated he had only been sober for four months in the last nineteen years. T. 863. These patently inconsistent statements concerning sobriety support the ALJ's credibility determination.

In addition, the ALJ only discounted claimant's credibility to extent he claimed he was disabled. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other subjective conditions]." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[11] People with objectively identical conditions can experience them in significantly different ways. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [or other subjective complaints a claimant] allege[s] [is] not credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). The same analysis can be applied to a diagnosis of depression, which must be based upon self-reporting. Thus, a physician may be told by a patient that he or she is depressed to a great degree, and the physician may believe it, but the ALJ is not

---

[11] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

bound by that.  The evidence as a whole, including the existence of corroborating medical opinions or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

The ALJ also emphasized the medical notes that showed claimant's self-reported symptoms were as not severe as he stated.  T. 31.  Throughout the record, plaintiff showed improvements in symptoms after treatment. T. 336-39, 597-98, 622, 769-71, 804-06.   When claimant entered into rehabilitation services or group counseling and did not drink, his anxiety, depression, and panic attacks consistently improved.  T. 336-39, 531-32, 555, 769, 805.  Claimant, by his own account, "ha[d] hopes of finding employment" after going through detoxification in January 2011. T. 657.  This conflicts with plaintiff's claim that he has been disabled since 2006. Considering plaintiff's inconsistent statements concerning his employability and periods of sobriety, as well as evidence reflecting symptom improvement with sobriety and treatment, there is substantial evidence to support the ALJ's findings as to claimant's credibility.

Hypothetical to VE

In his final point, plaintiff contends the ALJ's decision is not supported by substantial evidence because the hypothetical posed to the VE was incomplete. (Doc. 16, p. 16-17).  Specifically, plaintiff argues the hypothetical failed to include the limitations described in Dr. Ross's Mental Capacity Assessment and plaintiff's subjective reports of symptoms.  As discussed in the preceding sections, however, the ALJ's decision to discount portions of Dr. Ross's opinion, as well as plaintiff's credibility, is supported by substantial evidence.  Thus, the hypothetical posed to the

VE was not incomplete and the ALJ's reliance on the VE's testimony is supported by substantial evidence.[12]

## CONCLUSION

For the reasons stated above, the ALJ's conclusions concerning Dr. Ross's Mental Capacity Assessment and claimant's credibility are supported by substantial evidence. In addition, the hypothetical provided to the vocational expert was not incomplete.

Accordingly, it is ORDERED:

1.     The decision of the Commissioner is AFFIRMED and plaintiff's application for Disability Insurance Benefits is DENIED.

2.     The clerk is directed to close the file.

DONE AND ORDERED this 18th day of September, 2015.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[12] In a footnote, plaintiff notes a discrepancy in the transcript from the hearing. (Doc. 16, p. 17, n. 2). The transcript indicates the ALJ asked the vocational expert about the employability of an individual who "*can* use judgment in detailed or complex work related decisions." T. 90. The RFC in the ALJ's decision, however, indicates claimant "could not use judgment in detailed or complex work-related decisions." T. 26. The circumstances surrounding the hearing strongly suggest the VE provided testimony concerning an individual who could not use judgment in detailed or complex work-related decisions. The ALJ asked Dr. Strahl about plaintiff's ability to use judgment in and carry out detailed and complex work-related decision. T. 74. The hypothetical questions asked by the ALJ began with "could not" and "cannot." T. 74. Further, Dr. Strahl affirmed plaintiff's inability to perform these complex tasks. T. 71-74. The questions the ALJ asked the VE were verbatim the hypothetical questions the ALJ asked Dr. Strahl, except for the "can" use judgment in detailed and complex work-related decisions reflected in the transcript. T. 71-74, 87-91. In the context of the hearing, the ALJ would have no reason to change the hypothetical. Importantly, plaintiff concedes the appearance of the word "can" rather than "cannot" "is probably a typographical error[.]" (Doc. 16, p. 17, n. 2).

Case No. 5:14cv155/CJK